OPINION
{¶ 1} Ebony B., the mother of A.B., De.B., P.B., and Da.B., appeals from four judgments of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of the children to Montgomery County Children Services ("MCCS"). For the following reasons, the judgment will be affirmed.
 {¶ 2} The present appeal concerns four of Ebony's six children: A.B., born on April 26, 2000; De.B., born December 23, 2001; and twins, Da.B. and P.B., born on February 7, 2003. Paternity has not been established for any of these children, and the alleged fathers have not been part of the children's lives.
 {¶ 3} P.B. came under the care of MCCS in March 2003 because Ebony was having difficulty obtaining and keeping housing, had problems with anger management, and was not addressing P.B.'s medical issues, which included a heart condition and respiratory problems that required medication and monitoring.
 {¶ 4} On June 16, 2003, MCCS filed four separate complaints alleging that each of the four children was dependent due to Ebony's lack of stability and anger management issues. The complaint for P.B. also alleged that she was neglected because Ebony was not addressing her special medical needs.
 {¶ 5} MCCS created a case plan for Ebony and her children. The case plan required Ebony to obtain and maintain stable housing and income sufficient to satisfy her family's needs, obtain anger management counseling, establish paternity for her children, and address her children's medical needs. MCCS later added other conditions, including that she obtain a parenting/psychological evaluation, substance abuse counseling, and treatment for her depression. The substance abuse condition was subsequently deleted from the case plan. *Page 3 
 {¶ 6} In August 2003, Ebony reported that her landlord was getting ready to evict her for non-payment of rent. MCCS scheduled a pre-placement conference with her to be held in October 2003. On August 29, 2003, the trial court found that A.B., Da.B., and De.B. were dependent and placed them under MCCS's protective supervision. On September 4, 2003, the trial court found P.B. to be neglected and dependent, pursuant to an agreement by the parties, and it granted temporary custody of P.B. to MCCS, which would expire on June 20, 2004.
 {¶ 7} At the October 2003 conference, Ebony reported that emergency housing with the Salvation Army and the Red Cross were unavailable to her and that she did not have anywhere to go with the children. On October 23, 2003, Ebony voluntarily agreed to place A.B., Da.B., and De.B. with her sister, Monique. P.B. was already in foster care.
 {¶ 8} On March 2, 2004, Monique brought Da.B. to MCCS, indicating that she was unable to care for him. On March 10, 2004, the trial court awarded interim temporary custody of Da.B. to MCCS. MCCS placed Da.B. in a foster home with his twin sister, P.B. On May 6, 2004, MCCS requested an extension of P.B.'s temporary custody, which was subsequently granted. The agency stated that Ebony "has made progress, but has not completed her case plan objectives." On May 17, 2004, the trial court awarded temporary custody of Da.B. to MCCS.
 {¶ 9} On May 5, 2004, Monique brought A.B. and De.B. to MCCS, again indicating that she was unable to care for the children. MCCS placed A.B. and De.B. in a foster home together but in a different foster home than Da.B. and P.B. On July 23, 2004, the trial court awarded temporary custody of A.B. and De.B. to MCCS. *Page 4 
 {¶ 10} On October 18, 2004, MCCS filed a motion for permanent custody of P.B. and Da.B. On March 30, 2005, Ebony filed a motion for legal custody of P.B. and Da.B. with protective supervision by MCCS. On April 15, 2005, MCCS filed a motion for permanent custody of De.B. and A.B. Hearings on the permanent custody motions were held on August 9, 2005; October 25, 2005; and January 4, 2006.
 {¶ 11} On February 16, 2006, the magistrate issued four nearly-identical decisions, which granted MCCS's motions for permanent custody of the four children. In each, the magistrate concluded that Ebony had not completed her case plan objectives and that reunification with the children was not possible within a reasonable time. The magistrate found that Ebony lacked stable housing or income to support the children. It rejected Ebony's statement that she could go on welfare to support the children, noting that Ebony is able to work and that she is still troubled by narcolepsy (falling asleep without notice), which endangers the children. The magistrate thus concluded that the commitment of the children to the permanent custody of MCCS was in their best interest.
 {¶ 12} Ebony filed objections to the magistrate's rulings. She argued that MCCS had not made reasonable efforts to prevent the removal of the children or to eliminate the continued removal of the children. She further objected to the conclusion that granting permanent custody was in the children's best interest, and she argued that the magistrate's factual findings were against the manifest weight of the evidence. Ebony also contended that the guardian ad litem, who had recommended permanent custody to MCCS, did not thoroughly and objectively investigate the case before compiling his report. *Page 5 
 {¶ 13} On September 27, 2006, the trial court overruled Ebony's objections and found that the magistrate's decisions to grant permanent custody of the four children to MCCS were in their best interest.
 {¶ 14} Ebony appeals from the trial court's ruling, raising one assignment of error, as follows:
 {¶ 15} "THE TRIAL COURT ERRED IN ORDERING PERMANENT CUSTODY TO MONTGOMERY COUNTY CHILDREN'S SERVICES BECAUSE THE AGENCY FAILED TO PROVE ITS CASE BY CLEAR AND CONVINCING EVIDENCE AND THE COURT'S HOLDING WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."
 {¶ 16} In her sole assignment of error, Ebony claims that the trial court's ruling was not supported by competent, credible evidence and that MCCS did not meet its burden of proving that permanent custody to the state was in the children's best interest. Ebony argues that she substantially complied with the requirements of her case plan.
 {¶ 17} In a proceeding for the termination of parental rights, all of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); In re J.R., Montgomery App. No. 21749, 2007-Ohio-186, ¶ 9. The court's decision to terminate parental rights, however, will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.In re Forrest S. (1995), 102 Ohio App.3d 338, 345, 657 N.E.2d 307;Cross v. Ledford (1954), *Page 6 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus; see, also,State v. Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ]}24 (clarifying civil manifest weight of the evidence standard).
 {¶ 18} R.C. 2151.414(B)(1) sets forth the circumstances under which a court may grant permanent custody of a child to a children services agency. Pursuant to R.C. 2151.414(B)(1)(a), the court may grant permanent custody of a child if the court determines, by clear and convincing evidence, that (1) it is in the best interest of the child to grant permanent custody of the child to the children services agency, (2) the child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and (3) the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. If the child has been in the custody of the children services agency for twelve or more months of a consecutive twenty-two month period, the court need only determine whether permanent custody is in the child's best interest. R.C. 2151.414(B)(1)(d). In determining whether a child has been in the custody of the agency for the twelve or more months of a consecutive twenty-two month period, the court may not consider the period of time subsequent to the filing of the agency's motion for permanent custody. In re C.W., 104 Ohio St.3d 163,2004-Ohio-6411, 818 N.E.2d 1176.
 {¶ 19} In granting permanent custody to MCCS, the trial court issued four nearly-identical judgments, which stated:
 {¶ 20} "* * * To begin, the Court finds that the child has been in the care of MCCS *Page 7 
for 12 or more months out of the last 22 months. In January 2004, [Ebony] was presented with a Case Plan requiring her to address the following areas: obtain stable housing and income; schedule counseling for anger management and follow through with any recommendations; establish paternity; and attend any medical appointments for her children. The Court finds that while [Ebony] did make some progress on her Case Plan, she has yet to complete all the objectives. First, she has failed to address her housing situation. Since July 2004, [Ebony] has resided in Hannah House, which is a house owned by her church. While residing at Hannah House, [Ebony] is not required to pay rent or utilities. The house is not intended to be permanent in nature and the church could remove her at any time. Second, [Ebony] has yet to gain stable income. She has attempted to work at Kroger, Family Dollar, and Domino's but has failed to consistently maintain employment. Her only source of income is through braiding hair, which she estimates generates about $450 a month. Third, [Ebony] did complete anger management classes but continues to have anger related outbursts. Fourth, paternity has not been established. Lastly, [Ebony] has failed to consistently attend her children's medical appointments. She was given numerous verbal and written notices of the appointments by the Caseworker but still remained absent. Consequently, the Court finds that [Ebony] has failed to complete her Case Plan and that said child cannot be placed with [Ebony] within a reasonable period of time.
 {¶ 21} "Next, the Court finds that MCCS made reasonable efforts to assist [Ebony] with her Case Plan and continue the process toward reunification with the child: the Caseworker discussed the Case Plan with [Ebony] and regularly monitored visitation; the Agency has assisted with rent payments; made referrals to the job *Page 8 
center; provided her with bus tokens; made referrals to Family Services Association for anger management; and had provided extensive case management. The Court notes that the parent must show some affirmative effort in completing their case plan. It is the Agency's responsibility to act as a guide for the parents and was not established to force the parents to complete the case plan. Thus, the Court finds that the Agency did reasonably assist [Ebony] with her case plan and the reunification process.
 {¶ 22} "The Court finds that if the child was placed with [Ebony], it could pose a threat to the child's safety. [Ebony] has yet to address her anger management issues, which have led to sudden outbursts. Sharon Sanders, caseworker for MCCS, went to [Ebony's] house to observe her with her children during a scheduled off-site visitation. During the visitation, [Ebony] became very aggressive and told Ms. Sanders that she did not have `dominion over her children', and called her `the devil.' The situation became so intense that Ms. Sanders left the house because she noticed that [Ebony's] actions were adversely affecting the children. [Ebony] had another angry outburst during a meeting at the Agency, in which she had to be escorted out of the building because her behavior became so hostile. Additionally, [Ebony] has been diagnosed with a sleep disorder. [Ebony] does take medication for her sleep disorder but still becomes extremely tired at unexpected times during the day, which could greatly affect her ability to parent. Therefore, the Court finds that placement of the child with [Ebony] could pose a threat to the child's safety.
 {¶ 23} "[Ebony] also has not established a strong or reliable support system, outside of MCCS, for herself or for the child. The whereabouts of the alleged father are unknown and he has never participated in the child's life. Additionally, there are *Page 9 
no relatives or non-relatives willing and able to accept legal custody of the child. A strong support system is crucial for [Ebony] because she continues to rely on others to assist her in caring for the child. During testimony she stated that [she] did not need to attend medical appointments because that was the responsibility of the foster parents. Michelle Marvin, caseworker for MCCS, testified that [Ebony] failed to understand why MCCS could not continuously pay her rent and other living expenses. Further, [Ebony] testified that she must care for two other children through a shared parenting arrangement. Due to this, the Court finds that [Ebony] does not have an appropriate support system needed to assist her with the care of the child.
 {¶ 24} "As for the child's current placement, the child has been with the present foster parents for almost a year.[1] The foster parents have bonded with the child and said they would be willing to adopt if it became a possibility. The child is entitled to permanency. The Court feels that [Ebony] cannot provide the permanency necessary for a young child. For the foregoing reasons, the Court finds that the Decision of the Magistrate appears to be correct and that it is in the best interest of the child for Permanent Custody to be granted to MCCS." (Citations omitted).
 {¶ 25} On appeal, Ebony asserts that the trial court erred in concluding that she did not substantially satisfy the conditions of her case plan. Specifically, she disputes that her housing at Hannah House fails to satisfy the case plan, that she still has anger management issues, that she did not satisfy the parenting requirement, and that she has not addressed her sleep disorder. She further maintains that permanent *Page 10 
placement with the state is not in her children's best interest.
A. Case Plan Requirements
 {¶ 26} As stated above, Ebony's case plan required her to obtain and maintain stable housing and income sufficient to satisfy her family's needs, to obtain anger management counseling, to establish paternity for her children, to address her children's medical needs, to obtain a parenting/psychological evaluation, and to address her depression. It is undisputed that Ebony satisfied the requirement that she obtain a parenting/psychological evaluation.
1. Stable/Permanent Housing
 {¶ 27} First, Ebony disputes the conclusion that she failed to obtain and maintain stable housing. She argues that her case plan does not require her to pay rent or utilities, and that the imposition of such a requirement unfairly adds another element to her case plan. She further argues that the trial court's conclusion that Hannah House did not constitute a "permanent residence or stable housing" was unreasonable and not supported by the evidence.
 {¶ 28} Michelle Marvin, Ebony's caseworker from June 2003 through February 2004, testified at the permanent custody hearing that, when she first began working with Ebony, Ebony had recently obtained an apartment on Rockford and MCCS helped her to pay the rent and to furnish the residence. MCCS purchased couches, beds, cribs, and a stroller, and also helped to purchase food. Ebony also informed Marvin that the Job Center was using PRC funds to help her with the deposit and one month's rent. Marvin indicated that Ebony did not understand why MCCS could not continue to help pay for her rent. *Page 11 
 {¶ 29} In August 2003, Ebony had informed Marvin that her landlord was evicting her for nonpayment of rent. Ebony told Marvin that she could not go to the Salvation Army and Red Cross emergency housing because she had previously been evicted from those programs. Ebony informed Marvin that she was on a six-month wait list at Albright Apartments and that she had other places to live until she could get her own apartment. It was at this juncture that A.B., Da.B., and De. B. were placed with Monique. Ebony never moved into Albright Apartments because she owed approximately $432 to Dayton Metropolitan Housing Authority, which she needed to pay. Ebony acknowledged that her debt to DMHA is still outstanding.
 {¶ 30} Marvin indicated that her biggest concern about Ebony was Ebony's feeling that the agency needed to do everything for her. Marvin stated that she encouraged Ebony to be more self-sufficient.
 {¶ 31} Sharon Sanders, Ebony's current caseworker, testified that Ebony moved into Hannah House, a three-bedroom duplex funded by her church organization, Revival Center Ministry. According to Sanders, Ebony has not been charged rent to live at Hannah House, and Revival Center Ministry was paying her utilities and phone bills. In addition, during a time that Ebony was not receiving foods stamps, Revival Center Ministry also provided Ebony with food.
 {¶ 32} Sanders testified that, during a meeting with Ebony in August 2005, Ebony indicated that she had discussed paying $50 per month to Hannah House, based on income that she was receiving for braiding hair. Ebony had reported that they "were coming up with a system to track the money she was getting for braiding the hair, and they were going to initially charge her fifty dollars." Sanders did not *Page 12 
receive verification of this arrangement.
 {¶ 33} Sanders testified that the home was appropriate for the children. However, the concern was that Ebony was not paying any rent or utilities, and she could be asked to leave at any time. Sanders indicated that MCCS would prefer proof that Ebony can maintain stability by having responsibility for paying her bills, like rent and utilities. MCCS's "bottom line" on Hannah House was that it was temporary housing and that Revival Center Ministry's intent was to work with Ebony, through Project Impact, to become self-sufficient and to move on. Sanders stated that Revival Center Ministries indicated that there was a time limitation for their services.
 {¶ 34} On cross-examination, Sanders acknowledged that she did not discuss a particular time limit with Revival Center Ministry. She further acknowledged that Revival Center Ministry had said that they would work with Ebony "for as long as it took to make her self-sufficient." Revival Center Ministry had also indicated that it would be willing to help Ebony with her children if the children were returned to her.
 {¶ 35} Linda Landers, the paternal grandmother of Ebony's oldest two children, testified at the January 2006 hearing that Hannah House was created for Ebony, because they wanted her to have a stable home so that she could have her children returned. Landers acknowledged Ebony was living at Hannah House for free, but stated that "that was the purpose of the Hannah House" — to assist Ebony until she got established.
 {¶ 36} Ebony likewise acknowledged that Revival Center Ministry was providing full support for her housing. When asked if she would be prepared to support herself when the children were returned, Ebony responded: *Page 13 
 {¶ 37} "Well, I believe I'm going to be very prepared, because now * * *, when my kids come home, * * * I will be on assistance for them. And the church is — once the kids come home, their next step is to help me get out in something that I * * * can afford."
 {¶ 38} Ebony acknowledged that MCCS wanted her to demonstrate that she could pay her bills and rent. Ebony repeatedly testified that, once her children come home, she'll be able to get her life in order.
 {¶ 39} In our view, the trial court's determination that Hannah House did not satisfy the conditions of the case plan did not expand the requirements of the case plan, and it was not based upon insufficient evidence or against the manifest weight of the evidence. The essence of the trial court's ruling is that Hannah House is transitional housing, which was intended to help individuals, such as Ebony, until they were able to support themselves. Although Ebony had been living at Hannah House for a year and a half at the time of the January 2006 hearing and there is no evidence that she had been asked to leave at that point, the court apparently credited Sanders' testimony that Revival Center Ministry did not intend for Hannah House to be Ebony's residence indefinitely. Ebony herself stated that the Ministry's next step, after she had her children home, was to assist her in locating housing that she could afford. By rejecting Ebony's contention that Hannah House constituted permanent housing, the trial court did not add an unwritten requirement that Ebony pay rent. Rather, it merely credited the testimony that Hannah House was intended to be temporary assistance and not a location where Ebony could make a permanent home. Despite Ebony's longevity at Hannah House, the court had sufficient evidence upon which to conclude that Hannah House was not permanent housing, and we do not find that the *Page 14 
conclusion was against the manifest weight of the evidence.
2. Anger Management
 {¶ 40} Second, Ebony contends that MCCS did not prove by clear and convincing evidence that she did not meet the anger management requirement of her case plan. She argues that she completed an anger management course, and she asserts that her two incidents of anger were justified, considering that they occurred immediately after Ebony discovered through a third party that A.B. was receiving counseling for sexual abuse.
 {¶ 41} Initially, Marvin testified that Ebony wanted to talk about herself rather than the children, and that she often got angry reactions from Ebony. Sanders testified that, when she first became Ebony's case manager, she "got a lot of resistance" from Ebony, who stated that she did not understand MCCS's involvement with A.B., De.B., and Da.B., who were, at that time, under protective supervision. When Sanders attempted to hold a meeting with Ebony, Gwen Lewis from Project Impact, and two of Ebony's sisters, Ebony had an angry outburst. Ebony and her younger sister were escorted from the building by security. After that outburst, Ebony completed an anger management program through Project Impact.
 {¶ 42} Subsequent to Ebony's completion of the anger management program, however, Ebony had two additional confrontations with Sanders. Sanders testified that she went to Ebony's residence during a birthday party for A.B. in April 2005. In response to Sanders's presence, Ebony became very angry and "blaming". When Sanders continued to stay and interact with the children, Ebony became very hostile and asked Sanders to leave, stating that she "had no right to be there." Sanders *Page 15 
testified that when she tried to explain that she did have a right to observe these visits as part of her job, Ebony "just wouldn't let it go. It got worse." Sanders indicated that Ebony did not use profanity, but she was loud and angry. Sanders left because she noticed that the confrontation was affecting the children. Sanders indicated that she had encouraged Ebony to have the party.
 {¶ 43} Sanders testified that she had an additional incident in September 2005 (a month prior to Sanders' testimony), when she attempted to discuss new developments with A.B. Sanders stated: "[Ebony] became extremely irate, angry. She got up out of the couch, she made physical threats to slap me if I didn't get out of her house, and you know, it was a very threatening position. I have seen her angry before. I — I guess I never took it to be threatening as I did in that particular time. She stood up. She went to the door, she opened it. And, you know, at that time I gathered up my stuff and decided it was in everybody's best interest if I left."
 {¶ 44} Landers, who testified for Ebony, acknowledged that Ebony has "some anger issues" with her caseworker. Landers stated that she has talked to Ebony "about that" and has told her that she "can't talk to her like that, that she's got to talk in a tone * * * with respect * * * the same way as the caseworker." Landers stated: "[T]hey had to learn how to talk to each other, other than just, you know, raising their voices and getting upset."
 {¶ 45} In response, Ebony testified that Sanders had been "keeping things from me." Ebony stated that Sanders initially did not tell her that her daughter was in sexual behavior classes and that she had learned of them through her aunt. Ebony stated that when she and Sanders had a meeting about the sexual behavior classes, Sanders *Page 16 
"tried to make me believe that she told me before, and she never told me * * *." As for the birthday party, Ebony testified that Sanders did not want to ask for permission for Ebony to have the party. Ebony testified that Sanders had responded, "Girl, you know that I want to do nothing for you."
 {¶ 46} Upon review, we cannot conclude that the trial court erred in concluding that Ebony had not satisfied the anger management portion of her case plan. Although it is undisputed that Ebony completed an eight-week anger management course through Project Impact, the court reasonably credited Sanders's testimony that Ebony continued to struggle with anger management. Although the trial court could have credited Ebony's response that her outbursts were reasonable, considering the news that A.B. was receiving sexual behavior counseling, we cannot conclude that the trial court lacked clear and convincing evidence upon which to conclude otherwise.
"3. Sleep Disorder/Narcolepsy
 {¶ 47} Third, Ebony argues that the trial court failed to recognize the steps that she had taken to treat her narcolepsy and, consequently, the trial court's determination that she did not comply with her case plan objective was against the manifest weight and sufficiency of the evidence.
 {¶ 48} Ebony testified that she used to ignore her sleep disorder and that, as a result, she lost approximately five jobs. Ebony stated that she would fall asleep standing up or would move slowly, and her employer would terminate her employment. Ebony testified that she decided to seek help for her condition, and she is currently on medication. She stated, however, that she sometimes still feels sleepy during the day. When she does, she gets up and drinks some water or eats or takes her medicine. *Page 17 
Ebony indicated that, when she felt sleepy with the children in the home, she would have the children take "quiet time" or watch a movie and then take a quick nap. Ebony also indicated that her doctor had told her not to work because of her medication.
 {¶ 49} The record supports Ebony's contention that she has taken steps to address her sleep disorder, at least to some degree. However, the trial court had credible, competent evidence to conclude that it was still not fully resolved. Ebony acknowledged that she becomes tired during the day, that she sometimes has problems with sleepiness when she is cutting and braiding hair, and that, if she became tired when the children were at her home, she would take a nap while the children watched television. Accordingly, the trial court's conclusion that Ebony did not completely address her sleep disorder is not against the manifest weight of the evidence.
4. Parenting and Psychological Evaluation/Counseling
 {¶ 50} Finally, Ebony argues that the trial court erred when it failed to address the portion of the case plan that required her to complete a parenting and psychological evaluation. Ebony notes that she attended parenting classes through Project Impact, which MCCS found to be a suitable program. She also states that she took a finance class through Project Impact and has been attending monthly counseling sessions at Day-Mont West.
 {¶ 51} At the hearing, Sanders testified that Ebony completed the parenting and psychological evaluation, as required by the case plan. Sanders also indicated that she required Ebony to attend counseling due to concerns that Ebony was depressed. Sanders referred Ebony to Crisis Care, but Ebony chose to go to the Victor Cassano *Page 18 
Clinic. Although Ebony provided documentation that she was attending the Victor Cassano Clinic and had received a prescription for Zoloft, MCCS did not receive releases so that Sanders could speak with a doctor there. Sanders indicated that depression still appeared to be an issue. When Sanders spoke to Ebony in July 2005, Ebony indicated that she was speaking with Monica Burton at Day-Mont. Sanders verified that Ebony had started counseling with Burton. However, Sanders has not received any verification that she has been successfully discharged from Day-Mont. On cross-examination, Ebony indicated that she has seen Burton approximately six times since July 2005, and that they work on emotionally coping with any problems she is having. Ebony testified that she signed all of the release forms that Sanders had asked her to sign.
 {¶ 52} Although the trial court did not address the counseling aspect of Ebony's case plan, the trial court need not determine that Ebony failed to complete every aspect of her case plan in order to award permanent custody to MCCS. In this case, there was conflicting evidence as to whether Ebony had sufficiently addressed her depression. However, even assuming that Ebony's therapy at Day-Mont constituted substantial completion of the counseling requirement, the trial court found that Ebony's failures to substantially complete other aspects of the case plan warranted a divestiture of Ebony's parental rights. We therefore conclude that the trial court's failure to address the counseling portion of the case plan does not render its decision against the weight of the evidence or based on insufficient evidence.
 {¶ 53} In sum, we conclude that the trial court's determination that Ebony failed to "complete her Case Plan and that said child cannot be placed with [Ebony] within a *Page 19 
reasonable period of time" is not against the manifest weight of the evidence or based on insufficient evidence.
B. Best Interest of the Children
 {¶ 54} Ebony contends that the manifest weight of the evidence demonstrated that the termination of her parental rights was not in her children's best interest.
 {¶ 55} R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.
 {¶ 56} On appeal, Ebony argues that she has proven that she is a committed and caring parent who wants to be involved in the lives of her children. She asserts that, despite her past struggles, she has the basic resources to provide her children with a home, food, and clothing, and she now has a support system, namely her church. She further asserts that it is "irrelevant" whether anyone is interested in adopting the children, and she emphasizes the importance of keeping the family intact. Ebony also notes the potential threat of sexual abuse to A.B. by one of the older boys in her foster home.
 {¶ 57} Although the trial court had evidence that Ebony regularly visited with her children and the children enjoyed their time together, the trial court had additional *Page 20 
evidence that Ebony was not ready to care for the four young children, who had developmental delays or behavioral problems. Ebony attended few medical appointments for the children, although she received written notice and oral reminders. At the time of the magistrate's decision, three of the children had been in temporary custody for nearly two years, and P.B. had been in temporary custody for nearly three years. A.B. and De.B. have been in the same foster home since May 2004. Although the guardian ad litem recognized that Ebony had made progress toward achieving her case plan objectives, he concluded that permanent custody to MCCS was in the children's best interest and recommended that MCCS's motion be granted. Based on the evidence regarding Ebony's housing and income, the trial court reasonably concluded that Ebony could not provide the permanency that her children required. Accordingly, the trial court's conclusion that permanent custody of A.B., De.B., P.B., and Da.B. to MCCS was in the children's best interest was not against the manifest weight of the evidence.
 {¶ 58} The assignment of error is overruled.
 {¶ 59} The judgment of the trial court will be affirmed.
FAIN, J. and DONOVAN, J., concur.
[1] The judgment entries for De.B. and A.B. state "for over two years." *Page 1